July 13th 116346 Leola, Beharrell v. Switchcock Council, you may proceed. Thank you, your Honors. May it please this Honorable Court Counsel, Ms. Harrell, David Berrish, on behalf of the Appellant, Leola, Beharrell. This is the second time I have been before this Honorable Court on this case. The first time, an order under Rule 23 was issued precluding the Commission from using a report from Dr. Walsh because that report violated the law of the case, as it is substantially similar to a report issued by Dr. Spencer, which had been rejected by the Commission in its first decision in 2006. When I was here the last time, I urged this Court, okay, I begged this Court, to reverse the Commission and argue then, as I am arguing now, that once Dr. Walsh is excluded, there will be no report, what the Commission had done. I wished at that time to avoid a Dickensian Humber v. Humber, but understandably, and I think it was the right decision, this Honorable Panel remanded the case to the Commission. So what happened? And historically, we have returned. The Commission had issued a decision stopping temporal total disability, indifferently from the first time, but still, based upon the date of a report from the treating doctor, January 17, 2007, that report said that my client was at that point, now, 100 and being totally disabled. The Commission had also said that her condition had stagnated, which is something that the Commission sees that, right? Yes, it's something that the Commission sees that. I absolutely understand, Your Honor, and I will respond to that. The Commission cited zero evidence from the appellee, as none exists, in making a decision that is contrary to the manifest rate, contrary to all evidence in the record. Well, believe it, that's what I'm curious about. The Commission, Dr. Anicini's position, they cited the letter from Dr. Anicini in which she herself had said that the claimant had become permanently disabled, and knowing that the claimant's condition had stagnated, so they seized on the stagnated, and they disagreed with the permanently disabled, which, as you know, because of other, they looked in the medical records and found there was no other support in the records and notes itself to support the disability. Well, we're talking about MRIs. When you say there was no evidence, can't they look to Dr. Anicini's position of, has it become stagnated, has she become deconditioned? Is evidence available on that? But what the Commission did was not that. What the Commission did is they essentially said that they didn't believe Dr. Anicini. And the document believed Dr. Anicini on permanency. There's no place in there that said they didn't believe her on the question of whether the condition of the claimant had stagnated. I will agree that they said that, and I will agree that to some extent the Commission is entitled to make that determination that the appellant's condition had become stagnant. I am mindful of that, and I will get to the issue of what do we do with a person whose has some of the other evidence, frankly all of the other evidence. Because we don't understand. All our evidence for our benefit. We have a question for you if you'd like an answer. I apologize. So, yes, the Commission did say, seasoned upon Dr. Anicini, that the condition had become stagnant. And therefore she had reached MMI. And therefore she had reached MMI. What the Commission was ignoring, of course, was all the other evidence showing from doctors appointed by the city of Chicago, which I was going to get to, that she continued treatment, that she required rehabilitation. And I also wanted to put some context on January 17, 2007. January 17, 2007, this case had been argued and decided the day before, I believe, at the Circuit Court of Cook County, where we finally were going to win the original 19B. January 17, 2007, Ms. Burrell hadn't been paid in years. This Humbert v. Humbert case was just revving up its engine of delay. And this woman had been without pay and was frustrated and miserable. And it was clearly expressed in the doctor's report that this miserable woman who hasn't been paid in years has now become stagnant and deconditioned. And, yes, the Commission did say that she had become stagnant. And, yes, the Commission is entitled to parse from the facts. You are absolutely correct. Really, there's two separate issues, two levels of issues going on here. We had whether or not she was at MMI on the January date that Dr. Annachini used the phrase stagnant. But here's a question I've been meaning to ask and a favorite question of the week that's come up before. When someone's at MMI, does that necessarily mean that they fully recover from an injury? Yes or no? And the answer is no. And I will admit that it's an open book test because I was paying attention during the prior argument. So the fact that there's some pain management, as there have been other cases, there's some ongoing, was not necessarily evidence of the fact that the person undermined the climate during MMI, correct? Or is that your argument? There was some ongoing treatment or pain management. Therefore, the person can't be at MMI. That's not your argument, is it? I'm not saying they can't be at MMI. But I'm saying that if you look at the evidence in any interpretation possible, she just certainly wasn't at MMI. And give us that summary of the evidence. Well, what I'd like to do is I'd like to summarize the evidence using this panel's prior decision in Rule 23. And I will cover every single doctor that's been cited. Dr. Annachini, they questioned her. Okay. Dr. Annachini sends a patient to Dr. Ho. Dr. Ho recommends pain management and rehabilitation. And it's not just palliative. And it's not something you do for somebody who's at maximum medical improvement. You're trying to get that person to a better place, which may potentially make her more employable. So Dr. Ho says she needs rehabilitation and pain management. The city's doctor, Dr. Breyer from Mercy Works, in August of 2007, after this alleged termination of benefits, says she needs work conditioning because she's off of work. Work conditioning, once again, isn't palliative. Work conditioning helps us get a person in a better place so they can perhaps return to employment. And she, in fact, goes through work conditioning. So how she's an enemy for work conditioning described by the city's own doctor, well, baffles me. The doctor then recommends an EMG test for the diagnosis of carpal tunnel, which, understandable from those who have the record, has become a side issue. We are not claiming it is work-related. It's a law to decide if it is not a work-related condition. But she's clearly not able to do her job. She then sees the Rehabilitation Institute of Chicago as requested by the employer. In March of 2008, they recommend a comprehensive pain program. That never gets approved. And he says, yes or no? Corruption of pain is not, the cases suggest, is not the medical treatment that's been talked about. It doesn't cure the condition. Pain treatment merely masks the effect. And so there are cases that we've decided that have suggested that pain management treatment is not medical treatment post-MMI as would be an operation or something of that order. I believe that is mostly correct. But I also believe, Your Honor, that pain management can be something that occurs both before and after maximum medical improvement. It depends upon the facts. But I absolutely agree with you, Your Honor, that pain management is something that can occur after MMI. Because the question is where they're going to be. They're not going to get any better. But the premise being that they can learn to live and be less painful. But they're not going to improve their self. Whether that is the case here is never necessarily determined. And of course the Commission completely avoids that. Because they just haven't made any decision. She goes to see some different doctors through the Rehabilitation Institute of Chicago. Dr. Santos, who on April 24, 2008, says she is a chronic pain surgeon, recommends a pain program. She sees Dr. Breyer. Dr. Breyer, of course, mostly was a city doctor, said, you know what? The city never authorized it. I'm releasing you to while duty. Certainly, that moment, the Commission quit season to say that she's reached MMI. They didn't do that. They didn't talk about Dr. Breyer. Then she sees Dr. Walsh, who has been excluded, and I'll move on. Then I send her to see Dr. Crone, who has replied to Dr. Walsh. The Commission doesn't seem to like Dr. Crone. And even though Dr. Crone says that this woman is unable to work, I'll set him aside because the Commission is entitled to do that. And throughout my argument, I'm going to set aside Drs. Anakini and Crone because I believe the Commission, as misguided as it was, is absolutely entitled to set aside those doctors saying we don't believe them. So I'm going to say something that I think would be critical to your whole argument and your whole case this morning. The Commission makes a statement. Quote, there is support to find the claimant is at MMI and not in front of a fuller TTD, which makes some sense, or medical benefits. Is it correct? If the Commission believes that medical expense payments like TTD must cease when an employee reaches MMI, is that correct? Because that's critical to part of your argument about medical expenses, right? As regards medical expenses, absolutely not. And the prior question that you asked me goes exactly to that issue. Once a person reaches MMI, it doesn't necessarily mean they're not retired to further care or reception. I wouldn't spend a lot of time on the legal proposition of that. Subsequent to MMI, if she incurred medical expenses, she's entitled to have them paid for under 8A. This business of medical expenses and MMI is nonsense. I am, if your opponent steps up here and tries to argue it, you'll have a little trouble with me. I understand that I just feel obligated to answer Justice Hudson's question, and that's why. But given the issue of the TTD, because TTD does end at MMI, TTD ends at MMI, but entitled to medical expense, not necessarily. Because the question will remain, and I do intend to get to this, as to whether she's entitled to maintenance. And I think the Commission did make a statement as regards vocal rehab, which I will address. The question is, they draw up, as far as my concern is, out of thin air this date, and frankly, vindictively, I think, this date of January 17, 2007, a date when the treating doctor says, okay, now she's permanently disabled. They say, no, that's the date of MMI, we're cutting off benefits, which is absolutely amazing. She continues, in the city, not believing Dr. Walsh has been excluded, sends her to Dr. Conowitz for an examination. And my attitude is, okay, we've thrown everybody else out. We've thrown out Dr. Mancini. So let's see what Dr. Conowitz has to say. Dr. Conowitz says, I think we should get a functional capacities examination. She gets one. December 9, 2012, which I will tell you, in my opinion, which may not matter, is the date of MMI. Because on that date, she has a valid functional capacities evaluation that says she's at a sedentary level. This is a true MMI date. Where is there any evidence for cutoff? Well, we've already discussed that. If we're able to parse Dr. Ann Akili's report and say, we don't like that, we don't like that, we don't like that, but she says she's stagnant, and we're going to infer from the fact that she's stagnant, and we're going to turn it on its head and say she's now at MMI and not entitled to the benefits. Okay, I guess they can do that. Why is stagnate, given its normal meaning, why is it seizing on something that's ridiculous? So the doctor says the condition is stagnant. Is that an interpretation that it's covered as far as you can read? Is that a statement that has more to do with the litigation, as I mentioned, the context of when that came out? And if you want to take the commission at its face value, the reason why they didn't like this doctor to begin with, even though in the first decision they wrote, they said they believed her report was written to me over their examining physician, now, the fact that she's stagnant due to the litigation, she's going nowhere, they're going to say, oh, no, we're going to see that as a sign of MMI over all the other objective evidence that's in the record. So let's look at this. So the commission, well, let's assume. Let's take for argument, Your Honor, that she's in MMI as of this January date, as opposed to when she undergoes the functional capacities exam after she has all the medical care with doctors in the city applied. Let's do that. And if we do that, the commission says, this is one of my favorite quotes out of the commission The commission believes, it is reasonable belief, that the petitioner would not fully participate in vocational rehabilitation given the lack of effort the petitioner has demonstrated to find employment. That's at page four of their decision, their decision in reply to your Rule 23 order. So the commission has basically said, we don't need that vocational evaluation that we specifically ordered and that nobody gave. We're just going to say she won't cooperate with no evidence whatsoever to base it upon. So essentially, we know they're saying they're forecasting that she won't cooperate with actual vocational rehabilitation. I don't believe they're entitled to do that without a report. They're certainly entitled to do that if there were some things they could base it on. But that's not even the way it works. That's hell of speculation. It's absolute speculation and it's not the process. The process is, you first get, what did the commissioner order in 2006? Yes, a vocational assessment. We didn't get a vocational assessment. And I'm not going to speculate. I don't know whether that assessment is going to say, A, this woman with these conditions cannot work at all. There's no stable employment market for her. Or B, whether they're going to say there's a bazillion jobs out there for her. She can work. Or whether C, somewhere in the middle, well, she's going to have to go through the process. There's some jobs that we're going to identify and she has to go through with them. The commission is cynical about what will happen, but we don't know where that would go. Which is why the only appropriate reaction to the prior decision by this Honorable Court is to find this woman at NMI. We may disagree on where that is. The Vocational Capacities Report, after their examining doctor said she should get one, makes sense to me, February of 2012. But is the commission entitled to say she becomes stable in 2007? Of course the city is still paying her and agrees to pay her once they finally pay the award. Either way, once she's at NMI, we need the vocational assessment that was ordered 11 years ago. And then we can make those determinations. We can't. The commission's not allowed to, I'm not allowed to, and with all due respect, this Honorable panel isn't allowed to make stuff up, which they did. I would ask this matter be reversed. Let them reply. Thank you. Thank you, Counsel. Counsel, you may respond. Good afternoon, Your Honors. May it please the Court, Counsel. My name is Sean Ryan on behalf of the City of Chicago, a police in this case. Can we get something out of the way? I take it you agree that because a person has reached NMI, that doesn't mean they're not entitled to additional medical expenses if they relate to the underlying accident. I'm sorry, Your Honor, can you repeat the question? If they relate to the underlying accident, they're still entitled to medical payments. To medical benefits if they haven't reached NMI. No, if they have reached NMI. If that subsequent treatment, hypothetically, we're talking about is curative, provides curative relief. This is regarding pain medication, huh? In terms of? Post-NMI. Post-NMI, if that treatment is related and an award for benefits has been granted, then, yes, that person would be entitled to reasonable relief. If pain medication isn't curative, doesn't cure anything. No, I will say that pain medication is not curative. That is not a treatment to an ongoing condition. It's managing pain. So why would the condition say they were cutting off both TTD and medical payments merely because she'd reached NMI? That there was no further medical expenses that would be provided were not reasonable necessarily related to her injury. If she's suffering from the ongoing treatment, was the carpal tunnel, we would argue that there's pain related to her unrelated, as counsel pointed out, unrelated carpal tunnel condition. Well, you can make that argument, but here's really the problem with this. Tell me this is wrong. Did the arbitrator or the commission ever make any findings related to the nature of the claimant's medical expenses after January 17, 2007? Did they ever make any findings on those expenses related only to the unrelated carpal tunnel condition? Did they make any findings at all on those issues? In regard to the medical expenses, it is just that no further medical treatment at the employer's expense is due after 1-17-2007. And they say why? As having petitioner reached maximum medical improvement. But you know that's not true. You've conceded that. That, well, I would argue that she did. I'm not conceding that she did reach maximum medical improvement. You conceded that she didn't have certain ongoing maintenance treatments after you reached NMI, correct? Did you just state it? That you can have the need for pain medication that is not new treatment, further treatment, but it is managed. Even though you reached NMI. Even though you reached NMI. Yes, someone can incur the need for ongoing pain management, yes. So medical expense payments do not have to cease where an employee reaches NMI, correct? They do not necessarily have to cease, but in this case I believe it's fitting in that her continued need for medical treatment is unrelated to this condition in the sense that what we're talking about here is that they evaluated and based on the medical evidence provided determined that she had reached NMI as of 1-7-2017 and thus did not need further medical treatment in terms of related to this claim. But in terms of NMI date, I believe that it is the appropriate date supported, well supported in the record, not as counsel puts out by just one letter. This is Dr. Enichini, her treating physician, for extensive amounts of time, for multiple years, showed that condition, several of her reports read almost the same, that condition the same, petitioner could return to work, light duty work, condition unchanged, condition remained the same, resumed working light duty. And this is from 2005 through after, even after 2007, 2008, in the sense that, so that letter is an appropriate time and place to show that this is when she thought, her own treating physician thought the condition stagnated. All right, so that's clear. Is there any other evidence to support that conclusion besides the letter that's used now? Anything else to support the conclusion, NMI, Beck and McDaniel? Yes, I would say that it's not just that letter, as I was pointing out, it's the entirety of the medical record examined. They, as the commission, as we all agree, it is their job to review that evidence, assess the credibility of witnesses, weigh the evidence, make inferences from such evidence, and assess the credibility of witnesses, is what they did in this case. They reviewed all the medical evidence, not just Dr. Annanchini, and not just one letter from Dr. Annanchini, but her entire treatment history, and determined that it showed all of those years the condition had remained the same. Anything else beyond Annanchini that supports the conclusion of NMI? Any other doctors, any other evidence? The subsequent treatment that she sought afterwards that counsel identifies, again, I would agree with what was pointed out by the court, that this is pain management. It's merely addressing the ongoing complaints doesn't mean that she hasn't appropriately reached and been judged at NMI based on sufficient evidence in the record to be January 17, 2007. But what do you make of the statement, specifically, the commission's statement where the support defined claimant is at NMI, and not at federal court or TPD, okay, that goes on to say all medical benefits, not entitled to medical benefits. What do you make of that statement in the context of this case? In terms of how she could not be entitled to TPD benefits, but yet entitled to medical benefits. They say either or. They're saying she can't get TPD or medical benefits, or they won't. They didn't just say TPD, which maybe we can agree upon if we agree with the weight of the evidence. Where do you get this or medical benefits? They say she's cut off from any medical benefits. Seems to tie that statement, both TPD and medical benefits are both directly tied to NMI. And I thought you'd terminate that. Correct. Well, the commission decision does lump them together. I think that you're able to a comprehensive look at the record. Sorry, you were going to ask a question. Well, I like that argument. It's fun because it happens to look at the record. I'm citing their own words, and you're deflecting it with a comprehensive review of the entire record. Are we supposed to enjoy their specific language and do our own comprehensive review beyond? I mean, we can, but it sounds to me like the finding is pretty specific. I can't speak to how the commission wrote its decision in lumping TPD and medical benefits together. In looking at the record, I would argue that, as we've said, NMI is well-established as that date, and thus tying into that condition stabilized, as we've discussed, reaching NMI. When your condition is stabilized, no further TPD benefits. So then moving into why was that included in the same sentence, as your Honor had pointed out, I can't speak to how the commission wrote it that way. In arguing for why medical benefits would not be entitled to pass that point, as I had discussed that the condition remained the same is effectively what even petitioners all noted to her physicians that her symptoms were unchanged, condition remained the same, that there was no further medical treatment for that condition. What about the pain management treatment? What was that for? It was, I would argue, would be for the unrelated, as counsel agreed upon, unrelated carpal tunnel syndrome treatment subsequent to the NMI date. But then there's a specific sentence, and we've got to reach in with a limitation, don't we? Which the inference from, the reasonable inference made from the review of the records, indicating that the subsequent to that date, there was complaints related to the carpal tunnel syndrome, not to the issue at hand here. If there are no further questions for your Honors, for the reason discussed, we respectfully request this Court affirm the Cook County Circuit Court decision dated 12-9-2016. Thank you. Counsel mentioned that we should look at the entirety of the record. I couldn't agree more. Because once you get past the inference from stagnant to NMI in Dr. Anna Kinney, and look at any other evidence in the file, you see that this woman continued to be restricted, continued to be under medical care, and was not at NMI back in January 2007. When was she under medical care before? I will post January 17th. I will tell you, Your Honor, it is unclear to me, and I believe it is unclear from the Commission, as to whether that is a palliative post-NMI medical care, or something that helps her get more out of control so she can learn. On her medical records, is there anything in the record that we could point to to suggest that she received medical care post-January 17, 2007, for something other than carpal tunnel? Oh, pretty much all of them. What commissioning? All of it is for her low back. The carpal tunnel treatment, she was referred to an orthopedic surgeon and had a carpal tunnel release. They were completely different, and if you read the records, they're all because of her complaints of her low back. Her hand pain impacts this case in one aspect. It definitely delayed the time in which she was able to undergo the functional capacity done in February 2012. We will concede that. What medical records will we find post-January 17, 2007? The Rehabilitation Institute. Records of complaints for low back problems. Dr. Bleier at Mercy Works, Rehabilitation Institute of Chicago, and Dr. Santos at the Rehabilitation Institute of Chicago. I hesitate to add Dr. Anakini, but at least it documents complaints. What the commission is entitled to draw from her opinions is a document. Are there any complaints of anything other than pain? I'm not going to tell you from the top of my head, once in the record, other than knowing that the Rehabilitation Institute of Chicago and in Bleier's records, all this treatment was for the back. She saw an orthopedic surgeon for the carpal tunnel syndrome, and pain management care for carpal tunnel syndrome that hasn't been operated yet and hasn't become fed yet is kind of non-Euclidean. I mean, I don't even, it would be malpractice, it doesn't make sense to me, that you would even prescribe pain management care for carpal tunnel when you haven't had a failed release in some kind of weird. So, that's the best I can tell you. The council has asked a question, when the commission added the words, or medical benefits, and the or medical benefits helps me explain the absolute insanity and non-sequitur status of the commission's decision of the date of January 17, 2007. At best, at worst, it is the commission's reaction to this honorable panel's Rule 23 order and their opinion as to what they feel about being told what to do with Dr. Walsh. In terms of the pain for carpal tunnel syndrome, I read, address that, there's no question. It delayed the time in which she had the functional capacities evaluation. Otherwise, it's not part of this case. Other than the EMG test that was suggested for her low back pain revealed that she had it. Thank you. Thank you, counsel. The argument in this matter will be taken under five months' writ of this commission. We'll issue the clerk will stand and recess until 1-30-30.